Appellant ready to proceed? You may. May it please the Court, Heather Hacker for the Defendant Appellant. The District Court should have granted qualified immunity in this case for three main reasons. The first, Anderson cannot establish a constitutional violation because there's no evidence that Chief Justice Valdez even knew that Anderson had filed complaints against him. Second, Anderson also cannot establish a constitutional violation because he admitted that filing a complaint against Chief Justice Valdez was part of his job duties. And third, it was not clearly established at the time that an employee speaking in similar circumstances was engaging in protected activity. Starting first with causation, there is no need for this Court to decide the more difficult constitutional issues of whether Anderson's speech was protected and whether it was clearly established because Anderson has failed to put forth evidence to create a fact issue on the most fundamental element of his retaliation claim, that the Defendant knew about the speech in question. After discovery, there is no testimony or evidence suggesting that Chief Justice Valdez knew about the complaint that Anderson filed. Every justice of the Thirteenth Court of Appeals, all of their central staff, and Chief Justice Valdez's assistant, all testified that they did not know that Anderson had filed a complaint until after the decision was made to rescind his job offer. Anderson has no evidence to refute this. Anderson relies heavily on his claim that Justice Perks told him that Chief Justice Valdez retaliated against him. But even the District Court said that this does not place Chief Justice Valdez's knowledge at issue or in genuine dispute. In other words, even if it was true that Justice Perks said that, that doesn't prove anything about Chief Justice Valdez's knowledge. The District Court relied on the fact that other people at the Court knew about Anderson's complaints. Anderson said he told four people, but none of those individuals were involved in the decision not to hire Anderson, and there's no evidence that any of those people told Chief Justice Valdez or anyone else who was involved in the decision. So let's look at those four people that Anderson said he told. Two of those people were current employees of the Court, and two of them were former employees of the Court. First, Kaylee Holloway, who was Justice Perks' assistant, Anderson said he told her, but she was deposed and she specifically testified that she did not tell anybody else at the Court about that. Second, Anderson said he told Justice Vela, who at that point had already left the Court. There was no testimony in her deposition that she told anybody at the Court. The other two people that he named that he told were Patty Fowler, who was a current employee of the Court, and Kathy Wilborn, who had retired some years prior to that. Those witnesses were not even deposed. There's no evidence on the record that they spoke to anyone at the Court. Daniel Lockwood, who is Justice Perks' junior attorney at that time, said he didn't know about the complaints until after the decision was made to rescind the job offer to Anderson. And he said another briefing attorney at the Court, Megan Kemp, told him about it, but that she had communicated with Anderson. Lockwood also testified that he never heard anyone else at the Court talk about it, and that there was not a lot of office banter in general, even after the lawsuit was filed. And importantly, these people that Anderson said he told, and Anderson himself formally did, work in the Corpus Christi office of the Court. That Court is divided into two different offices. And Chief Justice Valdez and two other justices work in the Edinburgh office. So to sum it up, the district court is going to put this case to a jury on nothing more than pure speculation that rumors were spread by court employees in Corpus Christi that made it all the way to the Chief Justice in Edinburgh, with no evidence substantiating that. If it was true in this case that Chief Justice Valdez knew about these complaints, there would be some evidence of it, and there's none here. Even if we assume that Chief Justice Valdez knew about the complaints in this case, we still have a causation problem here, for two reasons. First, it's unclear whether Valdez was even the decision-maker in this case. Justice Perks had authority under the rules to hire who he wanted to. He testified he didn't want to push it after he was made aware of the fact that the other justices didn't think he should hire Anderson. And he also testified that he wouldn't have hired Anderson if he had known that the rest of the Court didn't like him. Second, there was a nondiscriminatory reason that Anderson was not hired, that he has failed to rebut in this case. The evidence shows that the Court did not want to hire Anderson because of known personality and performance issues. Let me ask you a question about the Court's structure. Does the Chief Justice have a say-so about the clerks that are not other justices on the Court? How is that done? Is the Chief Justice a central hiring point, or how does that work? According to the Court's rules, each justice can hire for their own chambers, and that's their decision. The Chief Justice has more of an administrative role in setting the salary and things like that, so he is involved in hiring, but according to the Court's rules, the ultimate decision generally rests with the justice at issue. The record shows, though, on two other occasions, Chief Justice Valdez had intervened in his role as Chief Justice where a justice wanted to make an inappropriate hire. But Justice Perks testified that he could have hired anyone he wanted to hire, didn't he? Yes, he did. The record shows that when the Court heard that he was considering hiring Anderson, one of the central staff expressed a concern that he was not capable of helping to draft civil opinions. And so she went back and looked at the Court's records, which dated back to 2008, and from civil opinions for the Court. Anderson has no evidence to contest that, and I don't believe that he does contest that. That right there is a nondiscriminatory reason why the Court shouldn't have hired him, because it's undisputed, or why the Court didn't hire him, because it is undisputed that Perks was behind on his docket and that he needed help specifically with civil cases. And the Court's records showed that there was a good reason to question whether or not Under this Court's decision in Gerhart, even if Anderson's complaint played a role in the decision, if he would not have been rehired anyway because of this concern, it would not be a constitutional violation. To sum up this issue of causation, summary judgment must be granted where critical evidence is so weak on an essential fact that it could not support a judgment in favor of the non-movement, and that is this case here. I'd like to turn now to the issue of job duties. Even if the Court determines that Anderson has enough evidence to demonstrate the causation element, he still cannot establish a constitutional violation because his speech was made pursuant to his job duties. The record shows that as a condition of employment with the Thirteenth Court of Appeals, as a briefing attorney, Anderson signed a statement agreeing to be bound by the Texas Code of Judicial Conduct. The Code of Judicial Conduct normally only applies to Texas judges. The statement that Anderson filed in the record shows that it was not only specific to the Thirteenth Court of Appeals, but it was also specific to briefing attorneys at the Court of Appeals, and it was signed by him and his boss, Justice Vaila. Anderson himself testified that compliance with the Code was part of his job duties. He admitted that he felt he should report Chief Justice Valdez after his judge chose not to for political reasons. It's also important to note that the information in this case was discovered in the context of a political campaign. The individual who obtained the information did so by a public records request, and that was the Republican Party of the county. In addition, at that time, Justice Vaila was running against Chief Justice Valdez for the position of Chief Justice. That's why she said she didn't want to report him, because she thought it would look too political. This Court in Wilson, and also suggested so in the Charles opinion, those are cited in our brief, has found that speech made pursuant to professional ethical duties that are part of the job is job-related speech. The previous opinion in this case offered up the idea of control as one possible factor the Court could look at to determine whether or not the speech is made pursuant to job duties. And here, there are legitimate reasons for the employer to control an employee speaking, even if they were speaking pursuant to an ethical duty. For example, if a court employee makes a false accusation against a sitting judge, it seems that the employer should be able to address that problem. And the specific context of this case is what makes this scenario unique in the law, because we're talking about essentially a law clerk here, who has a very special function in the judiciary. If a law clerk made an accusation against a judge, say, for bias, and that judge would probably have an interest in firing that clerk, because they could no longer trust them. The position of law clerk involves a great degree of trust between the judge and the clerk. In his response brief, Anderson tries to get around his admissions about job duties by law rather than an actual job duty. But not only is this contradicted by Anderson's own testimony, that places this case squarely in the distinction between general and ordinary job duties, which this Court already noted in this case, was clarified by the Supreme Court in Lane, which was not decided yet when the decision was made to rescind Anderson's job offer. When did Lane come down? September of 19—it came down in September of the year. I believe it was June 2014, Your Honor, and the decision— Very close. Yes. Yes. The decision was made to not rehire Anderson in May 2014. So I'd like to turn now to the issue of whether it was clearly established that Anderson's speech was protected. Given Anderson's testimony and the statement he signed as a condition of employment, compliance with the Code must at least be a general job duty. As the Court previously held in this case, if the Court determines that the issue implicates the ordinariness distinction from Lane, as Anderson appears to argue, it was not clearly established at the time that his speech was protected. Even if the Court finds that Anderson's speech does not implicate Lane, it was still not clearly established that his speech was protected because Anderson failed to meet his burden to point to a case that does not define the right at a high level of generality. That's most clearly illustrated by Anderson's nearly exclusive reliance on Garcetti, a case that established general doctrine regarding First Amendment retaliation claims and which specifically stated that because the plaintiff in that case admitted that his speech was made pursuant to his job duties, they were not speaking on how the Court would be able to determine whether or not speech was made pursuant to job duties in cases where there were serious questions about that, and that's this case. Anderson has pointed to no case holding that an employee's speech in similar circumstances was made pursuant to his job duties, and while there does not have to be an identical case, it does have to be particularized to the facts of this case such that it places the constitutional question beyond debate. As I mentioned before, there are several twists in this case that make this situation unique. The fact that this case involves a law clerk, the fact that adherence to the Code in this case was a specific job duty that was specific to this Court and this person as a briefing attorney in his position, and that he admitted that it was part of his job duty to report. Even if Chief Justice Valdez knew about Anderson's complaints, it cannot be said that a reasonable official would have known it was clearly unconstitutional to refuse to rehire a briefing attorney who had made an untrue complaint against him during a campaign based only on hearsay. The district court's decision denying qualified immunity was incorrect. Anderson failed to establish a constitutional violation, or even that Chief Justice Valdez knew about his complaints before his job offer was rescinded. And in any event, Anderson also failed to show that it was clearly established that his speech was protected. This Court should reverse the district court and render judgment for the defendant. Thank you. Thank you, Counsel. Mr. Morales. Yes, Your Honor. May it please the Court. Can a court restrict the rights of law clerks from a First Amendment perspective simply by requiring them to comply with the Code of Judicial Conduct? Chief Justice Valdez argues yes, but Garcetti says no. Notably, in Garcetti, the Supreme Court stated that we reject the suggestion that employers can restrict the rights of its employees by crafting excessively broad job descriptions. Now, in this situation, a fundamental flaw occurs in the palant's briefing that needs to be pointed out to the Court. On page 21 and on page 4 of their reply brief, 21 of the original brief, 4 of the reply brief, Chief Justice Valdez argues that the obligations to report a judge for malfeasance is broader under the state code than it is under the Texas Rules of Disciplinary Procedure. And that is fundamentally incorrect. The reason why that is important is that regardless of whether the 13th Court made the decision to incorporate the state code of judicial conduct, Mr. Anderson still had that obligation under the Texas Rules of Disciplinary Procedure. And as a result, that is what obligated him arguably to make that speech or his letters, not the state code on judicial conduct. Now, in the first appeal, this Court determined that whether the employer was entitled to control the speech determines whether that speech was made pursuant to official duties. Here, because that obligation stems from the Texas Rules that apply to all lawyers, whether they work for the government or not, the Court could not have instructed Mr. Anderson not to send those letters any more than it could have told him to ignore his ethical obligations. Ultimately, because the 13th Court had no right to discard the speech, because Mr. Anderson's letters were not official communications with official consequences, because there's clearly a citizen analog related to Mr. Anderson's speech, it was citizen speech protected by the First Amendment. Now, on the first issue raised by opposing counsel concerning causation, importantly and embarrassingly, I will admit that this is not an issue that we raised in our brief. We did submit it on a Rule 28J letter. Ultimately, the Court struck that letter sua sponte. But this Court does not have appellate jurisdiction to review the factual sufficiency of whether there's enough evidence for Mr. Valdez or Chief Justice Valdez to know about the complaints at issue. Importantly, Your Honors, there are a number of cases, specifically Kinney v. Weaver, Connolly v. Department of Texas, Charles v. Grief, and David v. McKinney, where this Court said that in a qualified immunity context, when you're dealing with the collateral order doctrine, the only thing the Court can review is materiality of issues, not genuineness. And if you look at the causation argument that opposing counsel raises, it is specifically based on genuineness. And she's asking the Court to say, well, this evidence should be weighed in favor in this way and whatnot. And interestingly, in Charles v. Grief, this Court actually admonished the Texas Attorney General of raising this issue, which the Court labeled as wasting the Court's time and resources. Now, in the event that the Court determines that it does have jurisdiction to review this issue, importantly, in the summary judgment context, there's more than enough evidence to suggest that Mr. or Chief Justice Valdez knew about Mr. Anderson's complaint. Tell me exactly what that evidence is. Absolutely. So the first point is, on Rule, actually Record 928, Valdez wrote an email to his staff saying that it was his decision concerning Anderson. He actually said, call me about my decision regarding Anderson. So as to who the decision maker here, it's clear that it was Chief Justice Valdez. And I'll get to the Mount Healthy mixed motives in a second. You're going to tell me about the evidence that he knew of Anderson's complaint? Yes. I'm getting there. You're getting there? All right. Thank you, Your Honor. So the next part of it is that Valdez testified that he took it upon himself to approach all the other judges and to tell them that he had personal issues with Mr. Anderson and that they should not hire him. So it demonstrates animus somehow from Chief Justice Valdez towards Mr. Anderson. And in response to the justices' questions from my opposing counsel, the Corpus Christi Court of Appeals rules are unambiguous that each judge should solely make decisions regarding their own chambers. So. Taking the long road to get there. Your Honor, here I will acknowledge that Chief Justice Valdez denies that he knew. That said. You understand my question? Yeah. My question to you was, what evidence is there that he knew? Right. What's your answer to that question? The evidence that he knew is that he chose to violate the 13th Court's policies with regard to Mr. Anderson. And then the question is why? Why would he violate this unambiguous policy to prevent Mr. Anderson from working at the 13th Court? And that's because there was some sort of animus. Now. Importantly, at the end of Mr. Anderson's term with Justice Vela, this is December 2012, and. You say there was some sort of animus. There seemed to be a lot of people who had complaints about Mr. Anderson. Well, interestingly, the question is when did they come up? Because in December of 2012, when Justice Vela retired from the court, Mr. Anderson actually asked for permission to volunteer for the court. And he asked Justice Perks whether he could do that. Justice Perks went to Justice Valdez and said, do you mind if Mr. Anderson works for a certain period of time in a volunteer capacity? And even Justice Benavidez, who is a big critic of Mr. Anderson, was consulted about that issue. At that time, nobody raised any concerns whatsoever about Mr. Hadn't Justice Benavidez already raised concerns about Anderson to Justice Perks prior to the interview? Not at that time. So there's two different time periods. All right. There's December 2012 when he asked to volunteer. So he's saying, can I work in a volunteer status? Well, basically, I get something else going on. And at that time, they could have easily said, no, we don't want him to work here because he's not good at his job. And then instead, all they said is, no, you wouldn't be covered by workers compensation insurance. We don't have enough computer equipment. And it would set a bad precedent to allow people to work here. And sometimes you just want to say, you're a really bad employee. Well, they could say that. Maybe they were just letting him down easy. But anyway, you go ahead. Well, mind you, nobody was communicating with Mr. Anderson. They were communicating with Justice Perks. So if they didn't think very highly of Mr. Anderson, they could have said so and not hurt Mr. Anderson's feelings. And then you fast forward to May of 2014 when Chief Justice, or I'm sorry, Justice Perks wants to hire Mr. Anderson. Now, notably, nowhere, no piece of paper before Mr. Anderson made these complaints was anybody ever critical of his work. And in fact, there's testimony that he was actually very good at it. Justice Perks wanted to hire him. Justice Vela gave him glowing reviews. He worked for four different justices over a 20-year period. Justice Perks' law clerk said that he was excellent and helpful to him during his time period. And ultimately, it was Justice Perks' sole decision to determine whether he wanted to hire Mr. Anderson. And you're right. Justice Benavides did tell Justice Perks that she had concerns about him before he made the offer. But notwithstanding those complaints, he still decided to proceed with making that offer, which was his decision to make. So why intervene now when Chief Justice Valdez didn't express any concerns in December 2012 about his work product? What changed between then and when, in May 2014, he wanted to hire him? Well, maybe one is, in 2012, it was a volunteer position, wasn't it? Well, he was asking to stay on after Justice Vela's term in a volunteer capacity. And one, so rather than weighing the policy considerations of whether workers' comp would apply or whether he had a computer equipment, they could just say, we don't want to make an exception for this guy because he's not a very good employee. Nobody ever said that. But instead, we know that between that time period and May of 2014, he raised a number of complaints about Chief Justice Valdez. And then Chief Justice Valdez said, I took it upon myself to go to those judges, tell them that I don't want Justice Perks to hire him because I have personal issues with him. In addition to the- So his goal is, he must have known or he wouldn't have raised these complaints about him. That's the evidence that he needed. That's right. And there's more. So in addition to that, we know that Justice Perks, or at least Mr. Anderson testified, that Justice Perks told him that was the reason why I wasn't allowed to hire you, because you made these complaints to him to the State Commission on Judicial Conduct. In addition to that, additional evidence is that in hiring Mr. Anderson's replacement, they again violated the rules, which is you need to have three to five years of minimum experience to be a senior attorney. However, they chose to look the other way when Mr. Lockwood was put into that position, and the question is why? Why violate all of these rules? Why is the Chief Justice intervening in somebody else's decision? And I will acknowledge it's circumstantial evidence, and we don't need to prove by direct evidence or direct evidence that that knowledge was there. And then also in the first opinion, this Court determined or stated — I thought Justice Perks asked for input from fellow justices. No. That didn't happen? No. In fact, if we look at record sites — That's not part of his testimony and his deposition? No. In 1690 and 1934, Perks testified that he was steadfast in favor of Bruce and only rescinded the employment offer because his decision to hire Anderson was countermanded by Valdez. And then on page 1934 — All I'm saying is he never testified that he asked for — that he sought input from his fellow justices. That's right. The timeline here is interesting because as soon as Justice Perks offered the job to Mr. Anderson, Mr. Anderson went down the hall and told the clerk. And then the clerk said, can I assume that you hired Mr. Anderson? And Justice Perks said, yes, that's right. And immediately, Justice Valdez, Chief Justice Valdez, started looking for reasons not to hire him. Let's look at his civil opinions, and importantly, Justice Vela unequivocally testified that Mr. Anderson worked on civil cases. So one of the problems with opposing counsel's argument is that they're trying to credit all of the testimony that's arguably in their favor and ignore the testimony that's in favor of Mr. Anderson, which in the summary judgment context is backwards. Your Honor, with regard to clearly established, Garcetti, even though it is the case that defines the exception about whether speech is made pursuant to official conduct or official duties, provides more than enough to inform any reasonable official that it would have Mr. Anderson's constitutional rights to terminate him because he gave that speech. So importantly, the first thing that Garcetti says is that it applies over employer control over things that it itself creates. So that if this court asks its law clerks to create bench memos, it can make the decision to do away with that practice. It could make the decision to change the format. It could make the decision to discipline a law clerk if they don't do it well. Well, here, the obligation to speak to the State Commission on Judicial Conduct, the Travis County District Attorney's Office, did not originate with the 13th Court of Appeals. Instead, it's 803B of the Texas Rules of Disciplinary Procedure, which specifically state that lawyers have an obligation to tell the authorities if a judge engages in conduct that arguably questions his fitness to serve. The other thing that Garcetti says is that when there's a citizen analog, it's going to be citizen speech. Importantly, in this case, in the first appeal, this court said that the type of speech that Mr. Anderson made, that that is exactly the type of speech that non-government lawyers make. It said all lawyers, not just lawyers that work for the government, have an obligation to report malfeasance. And then lastly, the Garcetti opinion says that official communications have official consequences. And because of those circumstances, a court or an employer has a heightened interest in controlling that speech. Notably, in the first appeal, this court already determined that Mr. Anderson's communications were not official communications with official consequences. Instead, they were citizen speech. And as a result of that, even though Garcetti is the initial — He sent a letter to the Chief Justice. Are we talking about that communication? He sent five total letters. One to Chief Justice Jefferson, two to — I'm sorry, one to the State Commission on Judicial Conduct, and three to the Travis County District Attorney's Office. So I think the question is, is all of them. Are all of them protected speech? Are they employee speech or citizen speech? Importantly, three of those letters, the ones to the Travis County District Attorney's Office, one was written four months after he stopped working for the court, another was written a year and four months afterwards, and then another one was written a year and five months after the fact. So how could he be speaking pursuant to an official job duty if he wasn't even working at the court anymore? And the answer to that question is this continuation argument. They cite Nixon. They cite a few cases from other circuits that, well, if the subject matter is the same, then it's just a continuation of previous speech. Well, there's two problems with that argument. The first problem is that the communications are different. If you look at the complaint that Mr. Anderson made to Chief Justice Jefferson and also the State Commission on Judicial Conduct, it focuses on double reimbursements from his campaign finance report and also from the court's filing fee fund, whereas the post-employment communications deal with double reimbursements from the Texas judiciary or Center for Judiciary and then from his, from the filing fee fund. In addition, there's new allegations that Mr. Anderson reported after he stopped working there that didn't exist at the time that he made his first letters while he was still working for the court. So first, fundamentally, this idea that they're the same substance is just inaccurate. In addition to that, in all the cases that opposing counsel cites on this particular continuation argument, both sets of speech were made while the individuals were still working for the court or for the employer in that case, where here we have speech and then in some cases a year and five months later, the second set of speech coming in. Now, most of the cases that opposing counsel cites on the clearly established issue are law enforcement cases, situations where a police chief or a sheriff will report to the FBI or to some external agency about, for example... When you viewed it, Lane held that... Yeah, so Lane basically introduced this idea of ordinary, whether this is ordinarily within somebody's job duties, and if it's not ordinarily within their job duties, then it can be protected speech. Well, we don't need to rely on Lane because the court in Garcetti said, we reject the notion that job descriptions alone can create an official job duty. And that's exactly what Chief Justice Valdez is arguing here. They're arguing because we created this obligation for law clerks to comply with the state code of judicial conduct, then that is a job duty. And it's true that Mr. Anderson testified that he had an obligation under the way that the Thirteenth Court defined his job to report it. But job descriptions by themselves are not enough. And in fact, although in an unpublished opinion in Williams v. Riley, this court stated that it is error to rely solely on a job description or a policy. In your view, Lane did not bring greater clarity to these issues. Well, no, I think it would be a different question after Lane. The question would be, was this ordinarily within his job or not? Our position here is because that obligation was not created by the Thirteenth Court, but instead by the Texas disciplinary rules, that it wasn't a job duty at all. I mean, if this court had told Mr. Anderson, as opposing counsel suggests, that he couldn't make that speech or that it shouldn't be different, as this court stated in the first appeal, that would be no job duty at all. It would be asking him to ignore his ethical obligations. So it's not that this is ordinary or not ordinary, it's that it was no duty at all because that  court, it's profession-required speech, not job-required speech. And if you look at Judge Crane's order below, he — that's a crux of his opinion, that the obligations under the State Code of Judicial Conduct and the Texas disciplinary rules are identical. And that's something that opposing counsel doesn't focus on. In fact, they state the opposite, like I said, on page 21 of their initial brief and then page 4 of their reply. You know, I do think that there was an issue with my time. It didn't start until later. If you want me to stop talking, I'm happy to do it. But in summary, seeing that the issue regarding causation appears to be of interest to the Court, importantly, appellate jurisdiction over that issue doesn't allow the Court to review that at this time. And although I admit that we failed to address that in our brief, appellate jurisdiction cannot be waived. Even if the Court decides to go to that issue, when you credit the evidence, the circumstantial evidence about whether Chief Justice Valdez knew, Justice Crane did not abuse his discretion and did not err. There is a conflict in the evidence about who knew when and specifically why Chief Justice Valdez chose to act in a way that violated the Court's policies. And the jury is certainly capable of making the decision as to whether that was motivated. There's additional cases where when other people know about the complaints and for unexplained reasons, somebody who doesn't supervise that person has a negative view towards that person that considered together, that can be enough evidence of knowledge and of causation. And we would cite the Court to those cases on the issue of causation. Ultimately, Your Honor, the Court doesn't have appellate jurisdiction on the causation issue. And it was clearly established because of Garcetti, because of Charles v. Grief, because of Davis v. McKinney, as this Court determined in the first appeal, those were all decided in Cutler. Now, Cutler was decided after this opinion, but it was stating the law as of the time that Chief Justice Valdez intervened. For those reasons, we would ask the Court to affirm the trial court's order. Thank you. Baruch. I'd like to pick back up on the jurisdictional argument that he's made. This Court does have jurisdiction, penitent jurisdiction. This Court already exercised penitent jurisdiction in the previous opinion over whether or not Anderson stated a claim because it was inextricably intertwined with the qualified immunity in the inquiry, and that's the same with this issue. As this Court very recently decided in the Escobar decision, where there's an issue of — that's inextricably intertwined in the qualified immunity question, that provides a basis for the Court to exercise penitent jurisdiction over that claim. In addition, it doesn't make a lot of sense here for the Court to reach these more complicated constitutional questions when Anderson has not put forth evidence that's sufficient to establish just the very basic element of a retaliation claim, which was that how can you have retaliation against — how can you retaliate against someone when you don't know that they've complained against you or if they've done anything against you? And in fact, this Court in the Gerhardt case did — did just this. And Judge Higginbotham, I think you had something to do with that opinion. But what happened in that case was the Court originally decided the case based on the job duties question or whether or not it was — whether or not the person's speech was protected. There was a petition for rehearing on Bonk filed. The Court amended its opinion and instead said, we don't — we didn't need to reach that issue. It was sufficient for us to just look at the fact that they didn't — that she didn't meet the causation element here. And so the Court ended up deciding the case on the causation element. And that was a summary judgment case as well. To clear up a couple of things raised on the Eppley's argument, the email that he references from Chief Justice Valdez — and this was part of the discussion about whether Valdez was a decision-maker — there was an email that he sent to his staff saying — and he sent to Justice Perks — said, our decision referencing the rest of the Court. It's not clear whether he's referencing a decision as to the final decision or not. And going back again to the Court's rules and Justice Benavidez's testimony and Chief Justice Valdez's testimony, that decision was still Perks's decision. And more importantly, Perks said that he would not have hired Anderson if he had known that the rest of the Court had these issues with him. He didn't want to make enemies on the Court. Valdez testified that he called Perks and voiced his concerns to him and said, why don't we ask the other justices what they think? And Perks agreed to that. And why did Perks agree to that? Because as he testified, he didn't want to hire somebody that the rest of the Court hated. Opposing counsel also references — he put a lot of emphasis on the fact that Anderson filing a complaint against Valdez, that that's what citizens do. And so where there's a citizen analog for the speech, that means that it can't be part of job duties. But that can't be dispositive here. And if you look at the concurring opinion in the Lane case, it explains why. Because the Court specifically said that — or the concurrence noted that we're — so that that case was all about testifying in court. And obviously citizens testify in court, so there's a citizen analog. But the concurrence noted that the outcome might be different where testifying in court is actually part of that public employee's job, like a police officer. So that really doesn't get us really anywhere in this case. Opposing counsel also mentioned the Travis County District Attorney's Office complaints and notes the fact that Anderson was not an employee when he made these complaints. However, they would have a causation problem on that point because they would then have to show if we have that Anderson's complaints that he made while he was an employee were not protected, they were pursuant to job duties, but his complaints that he made while he was not an employee were protected, then in order to win, Anderson would have to show that Valdez knew about the Travis County District Attorney's complaints and not the other ones, or that the other ones didn't have anything to do with his decision and his decision was based only on the Travis County District Attorney's complaints. And as we've already stated, he can't even show that Chief Justice Valdez knew about any of these complaints. Thank you, Your Honor. Thank you, counsel. We'll take the matter under advisement.